This matter has come before the Indiana Supreme Court on a petition to transfer jurisdiction, filed pursuant to Indiana Appellate Rules 56(B) and 57, following the issuance of a decision by the Court of Appeals. The Court has reviewed the decision of the Court of Appeals, and the submitted record on appeal, all briefs filed in the Court of Appeals, and all materials filed in connection with the request to transfer jurisdiction have been made available to the Court for review. Each participating member has had the opportunity to voice that Justice's views on the case in conference with the other Justices, and each participating member of the Court has voted on the petition.
Being duly advised, the Court DENIES the petition to transfer.
Massa, J., Slaughter, J., and Goff, J., vote to deny transfer.
Rush, C.J., dissents from the denial of transfer with separate opinion in which David, J., concurs.
Rush, C.J., dissenting.
Today, this Court declines to resolve an important question of law: whether stale evidence and the lack of a viable permanency plan can clearly and convincingly support a conclusion that terminating a mother's parental rights is in the best interests of her child. Because I believe that they cannot, I would reverse the termination order in this case and thus respectfully dissent from the denial of transfer.
Daughter was adjudicated a Child in Need of Services (CHINS) after her stepfather intervened in a sibling quarrel and slapped her face, leaving a handprint and welts. For this regrettable-yet isolated-act, the stepfather pleaded guilty to battery and was sentenced to probation. After violating a no-contact order, he went to prison, and daughter was placed in foster care. Two years later, DCS petitioned to terminate mother's parental rights. After a hearing, the trial court issued a termination order. Mother appealed, and a majority of the Court of Appeals affirmed. In re A.K.G., No. 02A03-1608-JT-1869, 83 N.E.3d 157, 2017 WL 1021936 (Ind. Ct. App. Mar. 16, 2017). Judge Bailey dissented, arguing that the "evidence in this case does not meet the heightened burden of clear and convincing," Id. at *8 (Bailey, J., dissenting). I agree.
The General Assembly has commanded dismissal of a termination petition that is unsupported by clear and convincing evidence. In re Bi.B., 69 N.E.3d 464, 465 (Ind. 2017). True, we pay significant deference on appeal to the trial court's judgment, setting it aside only after finding clear error. See In re R.S., 56 N.E.3d 625, 628 (Ind. 2016). But deference should never be mistaken for a rubber stamp, especially in cases that strip parents of the fundamental right to raise their children. In re Bi.B., 69 N.E.3d at 465 ("Few liberties are as central to our society as the right of parents to raise their children."). We thus must view these cases through a special lens: one that recognizes the high bar the legislature has set for severing the parent-child relationship and that ensures termination occurs only as a last-resort option, when *1084 all other reasonable efforts have failed. See In re R.S., 56 N.E.3d at 628, 631.
Our standard of review forces us to do just that. We examine the trial court's findings and conclusions, determining "whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment." In re E.M., 4 N.E.3d 636, 642 (Ind. 2014) (emphases added).
In her petition to transfer, mother challenges the conclusion that termination of her parental rights was in the best interests of her daughter. My close inspection of the record reveals that there is not clear and convincing evidence to support this conclusion because the trial court's findings were based on outdated evidence and because DCS had no viable permanency plan for the child. I address both troubling aspects briefly.
At the termination hearing, DCS called only two witnesses with up-to-date knowledge about mother and daughter. Tamra Powell, the family case manager, recognized that mother was pursuing reunification, had abided by the terms of daughter's foster placement, and had done what visitations she was allowed. Kristen Matheson, daughter's therapist, testified that therapy was helping both mother and daughter. She also wanted to see mother keep up her efforts to build her and daughter's relationship because "it's important to [daughter]" and "she loves her mom." Curiously, DCS failed to call any other then-recent providers to also testify.
Instead, DCS relied on witnesses who had not spoken to mother for over a year or two. One service provider had worked with mother and daughter for only three months in 2013-about two-and-a-half years before the termination hearing. A second provider had not worked with mother since July 2014. DCS also relied on the testimony of daughter's guardian ad litem (GAL), who admitted that he could not remember the last time he had spoken to the child, believing it was sometime prior to July 2014. And the GAL confirmed that he had not spoken to mother's then-current service providers (or at least could not recollect whether he had) and that he had not visited mother's then-current residence.
The trial court simply did not have the necessary evidence to get an accurate picture of mother's state of affairs at the time of the termination hearing . Unsurprisingly then, its findings overwhelmingly focused on mother's troubled past, such as her historical inability to maintain employment and to provide suitable housing. Perhaps, the current service providers would have given evidence that could have supported termination as in the best interests of the child. But they didn't because they were not called as witnesses.
The salient point is this: termination findings based primarily on stale (versus probative) evidence are necessarily both incomplete and misleading, and they certainly cannot clearly and convincingly support a conclusion that termination is in daughter's best interests. See In re C.M., 963 N.E.2d 528, 529 (Ind. Ct. App. 2012) (stressing the importance of DCS putting forth "evidence of 'current' conditions").
Compounding that problem is DCS's lack of a viable permanency plan. It is well-established that permanency is a "central consideration" when making a best-interests determination. E.g., In re G.Y., 904 N.E.2d 1257, 1265 (Ind. 2009). Here, DCS claimed that its permanency plan for daughter was adoption, emphasizing at the termination hearing that this plan need not be "final or detailed." Although this general sentiment is true, *1085 In re D.D., 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), trans. denied, a permanency plan must nonetheless have some likelihood of coming to fruition-otherwise it cuts against a determination that termination is in the best interests of a child. In this case, daughter was a teen diagnosed with ADHD and oppositional defiant disorder, had been in at least six different placements since being removed from mother, and had gone to respite care multiple times from foster care. Most notably, for several years DCS had simply been unable to find daughter an adoptive home. In other words, all signs pointed to daughter becoming a ward of the State until she reaches adulthood.
This Court has not hesitated to grant transfer and reverse a termination, even when a trial court has based its best-interests determination on a parent's incarceration and failure to fully comply with referred services, In re R.S., 56 N.E.3d at 629-30, or on a parent's past drug dealing and a child's current bond with his foster family, In re G.Y., 904 N.E.2d at 1258, 1264. I find this case even more compelling than those-as of the time of the termination hearing, mother had made significant, positive strides to improve her lifestyle for the sake of her daughter.
At the time of the termination hearing, mother undisputedly was employed, was on the road to a pay raise and full-time hours, and had established a 401(k) account for future financial stability. She had stable housing in a studio apartment and would get a bigger place if her daughter were returned to her. And she shared a close bond with her daughter and had been actively participating in services including visitation, therapy, and parenting classes. True, there were some issues that still needed to be resolved within the family unit, including the repair of stepfather's and daughter's relationship. So, reunification may have been inappropriate at the time of the hearing. But absent additional up-to-date evidence, more time could have-and should have-been given to mother to continue on her path to improvement. That outcome would properly honor the deep value inherent in the parent-child relationship. See In re R.S., 56 N.E.3d at 628.
In sum, as Judge Bailey recognized in his dissenting opinion, terminating parental rights was clear error. I would thus grant transfer and reverse the termination order.
David, J., concurs.